**ORIGINAL**   FILED

1   Stephen G. Larson (SBN 145225)
    *slarson@larsonobrienlaw.com*
2   Melissa A. Meister (SBN 296744)
    *mmeister@larsonobrienlaw.com*
3   Jarrad L. Wood (SBN 310688)
    *jwood@larsonobrienlaw.com*
4   **LARSON O'BRIEN LLP**
    555 S. Flower Street, Suite 4400
5   Los Angeles, CA  90071
    Tel:  213-436-4888
6   Fax:  213-623-2000

7   Jesse L. Hoyer (SBN 076934)
    *jlhoyer@jameshoyer.com*
8   Elaine Stromgren (SBN 417610)
    *estromgren@jameshoyer.com*
9   Sean P. Keefe (SBN 413828)
    *skeefe@jameshoyer.com*
10  **JAMES HOYER, P.A.**
    2801 W. Busch Blvd. Suite 200
11  Tampa, FL 33618
    Tel.: 813-375-3700
12  Fax: 813-375-3710
    *Pro Hac Vice to be filed*
13
    Attorneys for Relator
14  JEANNETTE MUNKITTRICK

2017 NOV 14  PM 3: 22

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY ___

PAID
NOV
1 4 2017
Clerk, US District Court
COURT 4612

15

16              **UNITED STATES DISTRICT COURT**

17      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

18  UNITED STATES OF AMERICA *ex*       Case No. **CV 1 7 - 0 8 3 1 0**-SVW(PJWx)
    *rel.* JEANNETTE MUNKITTRICK,
19                                      **COMPLAINT FOR FEDERAL**
                Plaintiff,              **FALSE CLAIMS ACT**
20  v.                                  **VIOLATIONS**
21
    CAMBRIDGE HEALTHCARE               **FILED *IN CAMERA* and UNDER**
22  SERVICES, LLC d/b/a CAMBRIDGE      **SEAL PURSUANT TO 31 U.S.C.**
    HEALTHCARE MANAGEMENT              **§ 3730(b)(2)**
23  SERVICES, LLC; THE ARBA GROUP;
    ANAHEIM CREST NURSING
24  CENTER, LLC; BRIARCREST            **DEMAND FOR JURY TRIAL**
    NURSING CENTER, LLC;
25  BROADWAY HEALTHCARE
    CENTER, LLC; BUENA VISTA CARE
26  CENTER, LLC; CAPISTRANO BEACH      Complaint Filed: November 14, 2017
    CARE CENTER, LLC; CASITAS
27  CARE CENTER, LLC; COMMUNITY
    CARE CENTER, LLC; COUNTRY
28  MANOR LA MESA HEALTHCARE

                                                          COMPLAINT

1  CENTER, LLC; GLENDALE
   HEALTHCARE CENTER, LLC;
2  HARBOR VILLA CARE CENTER,
   LLC; HIGHLAND CARE CENTER OF
3  REDLANDS, LLC; HUNTINGTON
   DRIVE HEALTH AND
4  REHABILITATION CENTER, LLC;
   LA SIERRA CARE CENTER, LLC;
5  LAGUNA HILLS HEALTH AND
   REHABILITATION CENTER, LLC;
6  LASSEN NURSING &
   REHABILITATION CENTER, LLC;
7  LYNWOOD HEALTHCARE CENTER,
   LLC; MADERA REHABILITATION &
8  NURSING CENTER, LLC; MAPLE
   HEALTHCARE CENTER, LLC;
9  MERCED BEHAVIORAL CENTER,
   LLC; MERCED NURSING &
10 REHABILITATION CENTER, LLC;
   MODESTO POST ACUTE CENTER,
11 LLC; MONROVIA GARDENS
   HEALTHCARE CENTER, LLC;
12 MONTE VISTA HEALTHCARE
   CENTER, LLC; MOUNTAIN VIEW
13 CONVALSCENT HOSPITAL, LLC;
   MURRIETA HEALTH AND
14 REHABILITATION CENTER, LLC;
   ONTARIO HEALTHCARE CENTER,
15 LLC; PROFESSIONAL POST ACUTE
   CENTER, LLC; QUINCY NURSING &
16 REHABILITATION CENTER, LLC;
   RANCHO MIRAGE HEALTH AND
17 REHABILITATION CENTER, LLC;
   RINALDI CONVALESCENT
18 HOSPITAL, LLC; RIVERSIDE
   HEALTHCARE CENTER, LLC; SEAL
19 BEACH HEALTH AND
   REHABILITATION CENTER, LLC;
20 SUNRAY HEALTHCARE CENTER,
   LLC; UNIVERSITY PARK
21 HEALTHCARE CENTER, LLC;
   VALLEY PALMS CONVALESCENT
22 CENTER, LLC; WATSONVILLE
   NURSING CENTER, LLC;
23 WATSONVILLE POST ACUTE
   CENTER, LLC; WEST COVINA
24 HEALTHCARE CENTER, LLC;
   DOUGLAS EASTON; and RICHARD
25 DENNING,

26                Defendants.

27

28

                                 2

1    This is an action brought by Plaintiff and *Qui Tam* Relator Jeannette

2  Munkittrick ("Relator") on behalf of the United States of America pursuant to the

3  Federal False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"). In support thereof,

4  Relator alleges the following:

5    **I.**

6    **INTRODUCTION**

7    1.    Beginning in at least 2015 and continuing through the present,

8  Defendants Cambridge Healthcare Services, LLC d/b/a Cambridge Healthcare

9  Management Services, LLC ("CHMS"), a large nursing home operator; The Arba

10  Group ("Arba"), a privately-held property ownership group; 38 California-based

11  Skilled Nursing Facilities ("SNFs") (Anaheim Crest Nursing Center, LLC;

12  Briarcrest Nursing Center, LLC; Broadway Healthcare Center, LLC; Buena Vista

13  Care Center, LLC; Casitas Care Center, LLC; Community Care Center, LLC;

14  Country Manor La Mesa Healthcare Center, LLC; Glendale Healthcare Center,

15  LLC; Harbor Villa Care Center, LLC; Highland Care Center of Redlands, LLC;

16  Huntington Drive Health and Rehabilitation Center, LLC; La Sierra Care Center,

17  LLC; Laguna Hills Health and Rehabilitation Center, LLC; Lassen Nursing &

18  Rehabilitation Center, LLC; Lynwood Healthcare Center, LLC; Madera

19  Rehabilitation & Nursing Center, LLC; Maple Healthcare Center, LLC; Merced

20  Behavioral Center, LLC; Merced Nursing & Rehabilitation Center, LLC; Modesto

21  Post Acute Center, LLC; Monrovia Gardens Healthcare Center, LLC; Monte Vista

22  Healthcare Center, LLC; Mountain View Convalescent Hospital, LLC; Murrieta

23  Health and Rehabilitation Center, LLC; Ontario Healthcare Center, LLC;

24  Professional Post Acute Center, LLC; Quincy Nursing & Rehabilitation Center,

25  LLC; Rancho Mirage Health and Rehabilitation Center, LLC; Rinaldi Convalescent

26  Hospital, LLC; Riverside Healthcare Center, LLC; Seal Beach Health and

27  Rehabilitation Center, LLC; Sunray Healthcare Center, LLC; University Park

28  Healthcare Center, LLC; Valley Palms Convalescent Center, LLC; Watsonville

3

1   Nursing Center, LLC; Watsonville Post Acute Center, LLC; and West Covina

2   Healthcare Center, LLC); Douglas Easton ("Easton"), an individual, and Richard

3   Denning ("Denning"), an individual (all of the above referred to collectively as

4   "Defendants") engaged in an intentional and fraudulent scheme to defraud the

5   United States by submitting statements and claims for payment to the Medicare

6   program which contained improperly inflated Resource Utilization Group ("RUG")

7   levels and false representations regarding care being provided to patients at

8   facilities owned and/or operated by Defendants.

9          2.      Medicare pays SNFs a daily rate to provide skilled nursing and skilled

10   rehabilitation therapy services to qualifying Medicare patients (or "Beneficiaries").

11   The daily rate Medicare pays a SNF depends heavily on the rehabilitation needs of

12   the Beneficiaries. The highest daily rate Medicare will pay a SNF is reserved for

13   those Beneficiaries that require "Ultra High" levels of skilled nursing rehabilitation

14   therapy, or a minimum of 720 minutes per week of skilled therapy from at least two

15   therapy disciplines (e.g., physical, occupational, speech). The next highest daily

16   rate Medicare will pay to a SNF is reserved for Beneficiaries that require "Very

17   High" levels of skilled rehabilitation therapy, or a minimum of 500 minutes per

18   week of skilled therapy. The Ultra High and Very High therapy levels are intended

19   for the most clinically complex patients who require rehabilitative therapy well

20   beyond the average amount of service time.

21          3.      As detailed herein, Defendants have engaged in a fraudulent and

22   systematic scheme to maximize the number of days they bill to Medicare at the

23   Ultra High and Very High levels. Defendants accomplish this by abusing modalities

24   that are completely unrelated to the Beneficiaries' actual conditions, diagnoses, or

25   needs.  Instead of providing skilled rehabilitation therapy that is tailored to the

26   Beneficiaries' particular needs, Defendants' therapist routinely provide generic,

27   non-individualized services that do not—and could not—benefit the Beneficiaries .

28

4

1  and that are provided solely to inflate Defendants' bills to Medicare for those

2  Beneficiaries.

3     4.    The FCA provides that any person who knowingly submits or causes

4  to be submitted to the United States of America (also referred to herein as the

5  "Government") a false or fraudulent claim for payment or approval is liable for a

6  civil penalty of $5,000 to $11,000 for each such claim submitted on or before

7  November 2, 2015, and $10,781 to $21,563 for each such claim submitted after

8  November 2, 2015, and three times the amount of the damages sustained by the

9  Government. The FCA permits persons having information regarding a false or

10 fraudulent claim against the Government to bring an action on behalf of the

11 Government, and to share in any recovery. The complaint must be filed under seal

12 without service on the defendants. The complaint remains under seal while the

13 Government conducts an investigation of the complaint's allegations and

14 determines whether to intervene in the action.

15    5.    Pursuant to the FCA, Relator seeks to recover on behalf of the United

16 States damages and civil penalties arising from Defendants' knowing submission of

17 false and fraudulent claims and certifications to the Government.

## II.

## JURISDICTION AND VENUE

20    6.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-

21 3733.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331

22 and 1345 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this

23 Court for actions brought under the FCA.

24    7.    This Court has personal jurisdiction over Defendants pursuant to

25 31 U.S.C. § 3732(a), which authorizes nationwide service of process because at

26 least one of the Defendants can be found in, resides in, transacts business in, and/or

27 has committed the alleged acts in the Central District of California.

28

COMPLAINT

8.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, and/or transacts business in the Central District of California, and many of the alleged acts occurred in this District.

9.     Relator is an original source as defined by the False Claims Act in 31 U.S.C. § 3730(e)(4)(B). Relator knows of no other FCA complaints that have been filed against Defendants alleging the same or similar facts. Additionally, Relator learned of the conduct underlying these allegations through her personal experience and in her capacity as an employee of Defendant CHMS. Relator made voluntary disclosures to the United States prior to the filing of this lawsuit.

## III.

## PARTIES

10.     Relator Jeannette Munkittrick is a resident of Glenwood Springs, Colorado. She has worked in Medicare claims compliance for more than 20 years. Relator has been employed with Defendant CHMS as a compliance auditor since September 2014. Relator brings this action on behalf of the real party in interest, the United States (also referred to herein as the "Government") pursuant to 31 U.S.C. § 3730(b).

11.     Defendant Cambridge Healthcare Services, LLC d/b/a Cambridge Healthcare Management Services, LLC ("CHMS") is located at 6722 Orangethorpe Avenue, #300, Buena Park, California 90620. CHMS is a privately-held company that currently manages 38 SNFs throughout California.

12.     Defendant Arba is located at 6380 Wilshire Boulevard, Los Angeles, California 90048. Arba is a privately-held property ownership group. It owns several of the Defendant facilities named in this Complaint.

13.     The Defendant SNFs are:

a.     Defendant Anaheim Crest Nursing Center, LLC, a SNF located at 3067 Orange Avenue, Anaheim, California 92804.

6

b.      Defendant Briarcrest Nursing Center, LLC, a SNF located at 5648 Gotham Street, Bell Gardens, California 90201.

c.      Defendant Broadway Healthcare Center, LLC, a SNF located at 112 East Broadway, San Gabriel, California 91776.

d.      Defendant Buena Vista Care Center, LLC, a SNF located at 1440 South Euclid Street, Anaheim, California 92802.

e.      Defendant Capistrano Beach Care Center, LLC, a SNF located at 35410 Del Ray, Capistrano Beach, California 92624.

f.      Defendant Casitas Care Center, LLC, a SNF located at 10626 Balboa Boulevard, Granada Hills, California 91344.

g.      Defendant Community Care Center, LLC, a SNF located at 2335 Mountain Avenue, Duarte, California 91010.

h.      Defendant Country Manor La Mesa Healthcare Center, LLC, a SNF located at 5969 Lake Murray Boulevard, La Mesa, California 91942.

i.      Defendant Glendale Healthcare Center, LLC, a SNF located at 1208 South Central Avenue, Glendale, California 91204.

j.      Defendant Harbor Villa Healthcare Center, LLC, a SNF located at 861 South Harbor Boulevard, Anaheim, California 92805.

k.      Defendant Highland Care Center of Redlands, LLC, a SNF located at 700 East Highland Avenue, Redlands, California 92374.

l.      Defendant Huntington Drive Health and Rehabilitation Center, LLC, a SNF located at 400 West Huntington Drive, Arcadia, California 91007.

m.      Defendant La Sierra Care Center, LLC, a SNF located at 2424 M Street, Merced, California 95340.

n.      Defendant Laguna Hills Health and Rehabilitation Center, LLC, a SNF located at 24452 Health Center Drive, Laguna Hills, California 92653.

COMPLAINT

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

o.     Defendant Lassen Nursing & Rehabilitation Center, a SNF located at 2005 River Street, Susanville, California 96130.

p.     Defendant Lynwood Healthcare Center, LLC, a SNF located at 3611 East Imperial Highway, Lynwood, California 90262.

q.     Defendant Madera Rehabilitation & Nursing Center, LLC, a SNF located at 517 S. A Street, Madera, California 93638.

r.     Defendant Maple Healthcare Center, LLC, a SNF located at 2625 South Maple Avenue, Los Angeles, California 90011.

s.     Defendant Merced Behavioral Center, LLC, a SNF located at 1255 B Street, Merced, California 95340.

t.     Defendant Merced Nursing & Rehabilitation Center, LLC, a SNF located at 510 West 26th Street, Merced, CA.

u.     Defendant Modesto Post Acute Center, LLC, a SNF located at 159 East Orangeburg Avenue, Modesto, California 95350.

v.     Defendant Monrovia Gardens Healthcare Center, LLC, a SNF located at 615 West Duarte Road, Monrovia, California 91016.

w.     Defendant Monte Vista Healthcare Center, LLC, a SNF located at 802 Buena Vista Street, Duarte, California 91010.

x.     Defendant Mountain View Convalescent Center, LLC, a SNF located at 13333 Fenton Avenue, Sylmar, California 91342.

y.     Defendant Murrieta Health and Rehabilitation Center, LLC, a SNF located at 24100 Monroe Avenue, Murrieta, California 92562.

z.     Defendant Ontario Healthcare Center, LLC, a SNF located at 1661 South Euclid Avenue, Ontario, California 91762.

aa.    Defendant Professional Post Acute Center, LLC, a SNF located at 81 Professional Center Parkway, San Rafael, California 94903.

bb.    Defendant Quincy Nursing & Rehabilitation Center, LLC, a SNF located at 50 East Central Avenue, Quincy, California 95971.

8

COMPLAINT

      cc.    Defendant Rancho Mirage Health and Rehabilitation Center, LLC, a SNF located at 39950 Vista Del Sol, Rancho Mirage, California 92270.

      dd.    Defendant Rinaldi Convalescent Center, LLC, a SNF located at 16553 Rinaldi Street, Grenada Hills, California 91344.

      ee.    Defendant Riverside Healthcare Center, LLC, a SNF located at 4580 Palm Avenue, Riverside, California 92501.

      ff.    Defendant Seal Beach Health and Rehabilitation Center, LLC, a SNF located at 3000 North Gate Road, Seal Beach, California 90740.

      gg.    Defendant Sunray Healthcare Center, LLC, a SNF located at 3210 West Pico Boulevard, Los Angeles, California 90019.

      hh.    Defendant University Park Healthcare Center, LLC, a SNF located at 230 East Adams Boulevard, Los Angeles, California 90011.

      ii.    Defendant Valley Palms Convalescent Hospital, LLC, a SNF 13400 Sherman Way, North Hollywood, California 91605.

      jj.    Defendant Watsonville Nursing Center, LLC, a SNF located at 535 Auto Center Drive, Watsonville, California 95076.

      kk.    Defendant Watsonville Post Acute Center, LLC, a SNF located at 525 Auto Center Drive, Watsonville, California 95076.

      ll.    Defendant West Covina Healthcare Center, LLC, a SNF located at 850 South Sunkist Avenue, West Covina, California 91790.

14.    Defendant Douglas Easton, an individual, was the Chief Executive Officer of Defendant CHMS. Easton is listed as an "indirect owner" of Defendants Casitas Care Center, LLC, Ontario Healthcare Center, LLC, and Rinaldi Convalescent Center, LLC.

15.    Defendant Richard Denning, an individual, is the Chief Executive Officer of Defendant CHMS.  Denning replaced Easton as the Chief Executive Officer of Defendant CHMS on or about February 2017.

9

# IV.

## REGULATORY OVERVIEW

**A.**     **The False Claims Act**

16.     The FCA, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21[1] provides, in relevant part:

> **Liability for Cert Acts**. (1) In General—Subject to paragraph (2), any person who—(a) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or (C) conspires to commit a violation of (A) or (B) . . . is liable to the United States for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . plus three times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

> **Actions by Private Persons**. (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government.

31 U.S.C. § 3730(b)(1).

17.     Relator seeks to recover damages and civil penalties in the name of the United States arising from the false statements and fraudulent claims for payment made by Defendants to the Medicare program.

**B.**     **The Medicare Program**

18.     The federal Medicare program was established by Congress in 1965 and provides health insurance to persons over the age of 65 and people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 1395o.

19.     The Medicare program is divided into four "parts" that cover different services.  Medicare Part A generally covers inpatient hospital services, home health

---

[1] The FCA was further amended on March 23, 2010 by the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. 111-148 Stat. 199. PPACA did not impact the portion of the FCA quoted here.

10

1    and hospice care, and skilled nursing and rehabilitation care, including care

2    provided at SNFs.  42 U.S.C. § 1395c.

3         20.    Medicare Part A covers only those services that are "reasonable and

4    necessary."  42 U.S.C. at § 1395y(a)(1)(A); *see* 42 U.S.C. § 1320c-5(a)(1) (stating

5    that providers must assure that they provide services economically and only to the

6    extent they are medically necessary); 42 U.S.C. § 1320c-5(a)(2) (providing that

7    Medicare services must be of a quality which meetings professionally-recognized

8    standards of care).

9         21.    Under the authority of the Social Security Act, the Secretary of HHS

10   administers the Medicare Program through Centers of Medicare and Medicaid

11   Services ("CMS"). CMS contracts with private insurance companies to administer

12   the processing of claims.

13        22.    Before a hospital or clinic may submit claims for reimbursement, it

14   must obtain a provider number.  42 U.S.C. § 1320d–2(b); 45 C.F.R. § 162.410.

15   Once it has a provider number, the provider may submit claims for covered

16   services. 42 C.F.R. § 424.505. In doing so, Medicare providers must certify their

17   understanding that payment of claims are conditioned on the claim and the

18   underlying transaction complying with applicable laws, regulations and program

19   instructions, including that the claim was for services that were reasonable and

20   necessary for the Beneficiary.

21   **C.    The Medicare Program's Coverage of SNF Rehabilitation Therapy**

22        23.    Subject to certain conditions, Medicare Part A covers up to 100 days

23   of skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness)

24   following a qualifying hospital stay of at least three consecutive days. 42 U.S.C.

25   § 1395d(a)(2)(A); 42 C.F.R. §§ 409.61(b), (c).

26        24.    The conditions that Medicare imposes on its Part A SNF benefits

27   include: (1) the patient requires skilled nursing care or skilled rehabilitation services

28   (or both) on a daily basis; (2) the daily skilled nursing services must be services

11

1    that, as a practical matter, can only be provided in a SNF on an inpatient basis; and

2    (3) the services are provided to address a condition for which the patient received

3    treatment during a qualifying hospital stay or that arose while the patient was

4    receiving care in a SNF (for a condition treated during the hospital stay). 42 U.S.C.

5    § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

6        25.    Medicare requires that a physician or other qualified practitioner

7    certify that these conditions are met at the time of a patient's admission to the SNF

8    and to re-certify to the patient's continued need for skilled rehabilitation therapy

9    services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare

10   General Information, Eligibility, and Entitlement Manual § 40.3 (2002), *available*

11   *at* https://www.cms.gov/Regulations-and- Guidance/Guidance/Manuals/

12   downloads/ge101c04.pdf.

13       26.    To be considered a "skilled" service, it must be "so inherently complex

14   that it can be safely and effectively performed only by, or under the supervision of,

15   professional or technical personnel." 42 C.F.R. § 409.32(a).  Professional or

16   technical personnel include physical therapists, occupational therapists, and speech

17   pathologists. *See* 42 C.F.R. § 409.31(a).

18       27.    Skilled rehabilitation therapy generally does not include personal care

19   services, such as the general supervision of exercises that have already been taught

20   to a patient or the performance of repetitious exercises (*e.g.*, exercises to improve

21   gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R.

22   § 409.33(d). Many SNF Beneficiaries "do not require skilled physical therapy

23   services but do require services, which are routine in nature. Those services can be

24   performed by supportive personnel; e.g., aides or nursing personnel . . . ." Medicare

25   Benefit Policy Manual, § 30.4.1.1 (2014), *available at* https://www.cms.gov/

26   Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c08.pdf.

27       28.    Because Medicare Part A will only reimburse SNFs for services that

28   are "reasonable and necessary," the services provided by the SNF must be

1  consistent with the nature and severity of the patient's individual illness, injury, or

2  particular medical needs; must be consistent with accepted standards of medical

3  practice; and must be reasonable in terms of duration and quantity. *See* Medicare

4  Benefit Policy Manual, § 30 (2014), *available at* https://www.cms.gov/

5  Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c08.pdf.

6       29.    In order to assess the reasonableness and necessity of those services

7  and whether reimbursement is appropriate, Medicare requires proper and complete

8  documentation of the services rendered to Beneficiaries. In particular, the Medicare

9  statute provides that:

10         No payment shall be made to any provider of services or
other person under this part unless there has been furnished

11         such information as may be necessary in order to determine
the amounts due such provider or other person under this

12         part for the period with respect to which the amount are
being paid or for any prior period

13       42 U.S.C. § 1395l(e)

14

15  **D.**    **Medicare Payment for Skilled Nursing Rehabilitation Therapy**

16       30.    The Balanced Budget Act of 1997 changed SNF reimbursement for

17  patients covered under Medicare Part A to a prospective payment system ("PPS"),

18  beginning with the first cost reporting period on or after July 1, 1998. Under PPS,

19  SNFs are paid a fixed per diem amount for each Medicare Part A Beneficiary,

20  which covers the routine, ancillary, and capital-related costs associated with that

21  patient's stay, including non-physician services. See 63 Fed. Reg. 26, 252, 26, 259-

22  60 (May 12, 1998).  The SNF is responsible for paying for virtually all patient care

23  services, including physical and occupational therapy services, out of this Part A

24  per diem payment. This relationship is known as "billing under arrangement" and

25  requires a contractual agreement between the nursing home and its non-physician

26  suppliers or providers. 42 C.F.R. §482.75(h)(2).  Medicare payments are typically

27  made directly to SNFs rather than to Beneficiaries.

28

COMPLAINT

31.     The daily PPS rate that Medicare pays a SNF depends on the Resource Utilization Group ("RUG") to which a patient is assigned. Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to Beneficiaries with similar characteristics or resource needs. *See* 42 C.F.R. §§ 413.330, 413.337.

32.     There are five general rehabilitation RUG levels for those Beneficiaries that require rehabilitation therapy: Rehab Ultra High ("RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM") and Rehab Low ("RL").

33.     The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes a patient received as well as the number of therapy disciplines the patient received during a seven-day assessment period known as the "look-back period." The chart below reflects the requirements for the five general rehabilitation RUG levels:

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU | Minimum 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least five days per week |
| RV | Minimum 500 minutes per week total therapy; one therapy discipline must be provided at least five days per week |
| RH | Minimum 325 minutes per week total therapy; one therapy discipline must be provided at least five days per week |
| RM | Minimum 150 minutes per week total therapy; must be provided at least five days per week but can be any mix of therapy disciplines |

14

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

| RL | Minimum 45 minutes per week total therapy; must be provided at least three days per week but can be any mix of therapy disciplines |
|---|---|

34.   Medicare pays the most for those Beneficiaries that fall into the RU level. The RU level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26, 252, 26, 258 (May 12, 1998).

35.   A nursing facility must determine each patient's RUG as of specific "assessment reference dates" ("ARDs"), and the RUG as of the ARD then determines the daily reimbursement rate prospectively for a specific timeframe. According to CMS, the Medicare assessment schedule is as follows:

| RUG Assessment Type | ARD Window | Grace Days | Medicare Payment Days Determined by RUG |
|---|---|---|---|
| 5 day | Days 1–5 | Days 6–8 | Days 1–14 |
| 14 day | Days 13–14 | Days 15–18 | Days 15–30 |
| 30 day | Days 27–29 | Days 30–33 | Days 31–60 |
| 60 day | Days 57–59 | Days 60–63 | Days 61–90 |
| 90 day | Days 87–89 | Days 90–93 | Days 91–100 |

The "assessment window" equals the ARD window plus the grace days.

36.   SNFs report therapy treatment times for each assessment reference period on a Minimum Data Set ("MDS") form that is completed as of each ARD in a patient's stay. 42 C.F.R. § 413.343. SNFs transmit this data directly to CMS. 42 C.F.R. § 483.20(f)(3). Completion of the MDS is a prerequisite to payment under Medicare. *See* Medicare Program; Prospective Payment System and

15

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

1   Consolidated Billing for Skilled Nursing Facilities, 63 FR 26265–69 (May 12,

2   1998).

3        37.    The MDS form requires a certification by the provider stating, in part:

4   "To the best of my knowledge, this information was collected in accordance with

5   applicable Medicare and Medicaid requirements. I understand that this information

6   is used as a basis for ensuring that residents receive appropriate and quality care,

7   and as a basis for payment from federal funds." *See, e.g., Long-Term Care Facility*

8   *Resident Assessment Instrument 3.0 User's Manual*, Centers for Medicare &

9   Medicaid Services (Nov. 13, 2017, 4:45 PM), https://www.cms.gov/Medicare/

10  Quality-Initiatives-Patient-Assessment-Instruments/NursingHomeQualityInits/

11  Downloads/MDS-30-RAI-Manual-V113.pdf.

12  **V.**

13  **FACTUAL ALLEGATIONS**

14  **A.**    **Defendants' Scheme to Defraud Medicare**

15       38.    From at least 2015 and continuing through the present, Defendants

16  have focused on maximizing their profits by systematically billing Medicare for

17  artificially-inflated RUG rates. Defendants prioritize their maximization of earning

18  potential over compliance with Medicare regulations and with disregard for patient

19  needs.

20       *1.*    *Relator's Knowledge of the Fraud*

21       39.    Relator began her employment as a compliance auditor with Defendant

22  CHMS in September 2014. She conducts quarterly compliance audits at all 38

23  skilled nursing facilities named as Defendants in this Complaint. Therefore, Relator

24  has original, first-hand knowledge of all improper practices alleged herein.

25       *2.*    *Defendants Submit Medicare Claims Using Artificially*

26                    *Inflated RUG Rates*

27       40.    Because Medicare pays significantly more money for RU and RV

28  Beneficiaries than for Beneficiaries at lower RUG levels, Defendants push their

16

1   facilities and therapists to get as many of their Medicare Beneficiaries into the RU

2   and RV RUG levels as possible. Defendants accomplish this by pressuring

3   therapists to abuse electric stimulation ("e-stim") and diathermy modalities, and to

4   report incorrectly the minutes attributable to their application. As detailed herein,

5   the minutes for the e-stim and diathermy modalities are reported in a manner

6   inconsistent with normal treatment patterns, and appear to spike during lookback

7   periods. The treatments are not usually provided to non-Medicare patients.

8           a.      Defendants Use Unnecessary Modalities in Order to

9                   Increase the Number of Therapy Minutes Billed to

10                  Medicare

11      41.   "Modalities" generally describe treatments such as heat, cold, and

12   electrical stimulation that are used to produce a tissue response to help reduce pain

13   and inflammation, or to strengthen, relax, or heal muscles. Modalities are typically

14   used as an adjunct to active therapy to decrease impairments and improve function.

15   Many modalities do not require the skills of a qualified therapist unless there is a

16   particular complication with the patient.

17      42.   E-Stim and diathermy are two modalities being abused by Defendants

18   in order to increase the number of minutes of therapy recorded for Medicare

19   patients. E-stim refers to the practice of attaching electrodes on a patient's skin in

20   order to apply electrical stimulation to targeted muscle groups. It is generally used

21   to treat muscle spasms and pain. Diathermy is a treatment that uses a high-

22   frequency electric current to stimulate heat generation within body tissues. It is

23   most commonly used for muscle and joint conditions.

24      43.   Both e-stim and diathermy can be proper therapy options for patients

25   in SNFs under certain circumstances.  However, because these modalities typically

26   do not require the skills of an occupational therapist for application, when they are

27   utilized in a SNF, it is only appropriate to use them for particular diagnoses;

28   specifically, for diagnoses for which there is evidence suggesting they are

17

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

1   beneficial treatment methods that can potentially help further patient outcome

2   goals, or for patients whose conditions are complicated by other factors and who

3   require the judgment of a qualified therapist even for application of non-skilled

4   therapies.

5       44.   Relator recognizes it is possible to use e-stim and diathermy

6   appropriately in SNFs; specifically, in the limited situations described above.

7   However, based on what she has observed during her employment with Defendant

8   CHMS, it is clear that Defendants are not using these modalities to help patients,

9   and are instead abusing these modalities in order to bill Medicare improperly.

10      45.   On or about 2015, Relator began to observe a distinct pattern that

11   showed inordinate levels of RU and RV qualifications for Medicare patients at all

12   of the Defendant SNFs. The minutes being reported to qualify patients for the RU

13   and RV levels were exactly at, or slightly higher than, the minimum requirements

14   for those RUG levels. The above-described practice of delivering therapy on or as

15   close to the minimum amount of minutes necessary to meet a particular RUG level

16   is colloquially referred to as "hugging the RUG."

17      46.   Defendants regularly "hug the RUG" by using e-stim and diathermy in

18   order to record the minutes necessary to qualify Medicare Beneficiaries improperly

19   for RU and RV status. For example, if a Medicare patient is 50 minutes shy of

20   qualifying for the RU or RV RUG level during a lookback period, Defendants'

21   therapists will introduce the utilization of either e-stim or diathermy to make up the

22   50 minutes needed, regardless of whether that modality is beneficial to the patient.

23   Defendants' therapists often employ this tactic with Beneficiaries who cannot

24   tolerate actual skilled therapy for the full amount of time necessary to qualify for

25   the higher RUG levels.

26      47.   Defendants' therapists know that they are under pressure to qualify as

27   many Medicare patients as possible for RU and RV levels, so they often include e-

28   stim and diathermy in the patients' Plans of Care just in case they need to abuse

18

1  those modalities in order to reach the RU and RV RUG levels.  E-stim and

2  diathermy are included in the Plans of Care of Beneficiaries at Defendants' SNFs

3  regardless of whether those modalities will provide any actual benefit for the

4  patients.

5       48.    In addition to providing medically unnecessary e-stim and diathermy

6  therapy in general, Defendants also use these modalities to inflate the number of

7  therapy minutes reported on MDS assessments by including non-supervised and

8  non-skilled minutes in the calculations. Instead of including only minutes spent

9  under direct supervision of a skilled therapist, Defendants improperly bill Medicare

10  for time that should not be included in the total calculation of therapy time. For

11  example, if e-stim is used on a patient—whether properly or improperly—

12  Defendants' therapists routinely bill for the time it takes to attach the electrodes,

13  and then continue to bill for the entire time the electrodes are attached, even though

14  the therapists generally leave the patients alone while the e-stim treatment occurs.

15  Defendants' therapists also improperly include minutes that are spent on activities

16  that have nothing to do with skilled care, such as on tasks like cleaning patients'

17  skin for electrode attachment.  It is Relator's assertion that, in general, billing for

18  any amount of time over approximately five minutes for treatment like e-stim or

19  diathermy is improper.  Because Defendants abuse e-stim and diathermy in order to

20  "hug the RUG," the minutes billed for those modalities are usually much higher

21  than five minutes.

22       49.    "RUG hugging" using the diathermy modality is reflected in patient

23  records like the ones shown below. The following relevant excerpts are from the

24  file of a patient treated at Defendant Mountain View Convalescent Hospital, LLC.

25  The patient did not have a condition that required a skilled therapist for diathermy

26

27

28

19

COMPLAINT

treatment. The patient's April 2015 CPT[2] Log reflects the following use of diathermy for the 5-day scheduled assessment:

| Date | 4/19 | 4/20 | 4/21 | 4/22 | 4/23 |
|---|---|---|---|---|---|
| Minutes of diathermy | ___ | 30 | 30 | 30 | 30 |

The patient's corresponding MDS shows the amount of minutes for that lookback period totals 725, five minutes above the 720-minute standard necessary to qualify a patient in the RU level for Medicare billing purposes.

50.     The next assessment period for the same patient referenced in Paragraph 49 reflects the following use of diathermy for the remainder of April:

| Date | 4/24 | 4/25 | 4/26 | 4/27 | 4/28 | 4/29 | 4/30 |
|---|---|---|---|---|---|---|---|
| Minutes of diathermy | ___ | ___ | 30 | 30 | 30 | 30 | 30 |

Again, an excessive number of minutes being attributed to diathermy, with the amount of minutes in the patient's corresponding MDS totaling 720—the exact amount of minutes needed to keep that patient qualified as RU for Medicare billing purposes.

51.     An example of "RUG hugging" using the e-stim modality can be seen in the following excerpt from the file of a patient treated at Defendant Glendale Healthcare Center, LLC. The patient did not have a condition that required a skilled therapist for e-stim application. Regardless of that fact, the patient's Plan of Care

---

[2] "CPT" stands for Current Procedural Terminology ("CPT") codes, which are used to bill for skilled services under Medicare.

20

included the use of e-stim and the patient's March 2016 CPT Log reflects the following use of e-stim for the lookback period beginning on 3/9/16:

| Date | 3/3 | 3/4 | 3/5 | 3/6 | 3/7 | 3/8 |
|------|-----|-----|-----|-----|-----|-----|
| Minutes of e-stim | ___ | 15 | 15 | ___ | ___ | 15 |

As seen in the patient's corresponding MDS, the amount of minutes for that lookback period coincidentally totals 500, which is the exact number of minutes necessary to bump the patient from an RH to an RV level.

52.    The next lookback period (the 14-day assessment) for the same patient reflects the following use of e-stim:

| Date | 3/9 | 3/10 | 3/11 | 3/12 | 3/13 | 3/14 |
|------|-----|------|------|------|------|------|
| Minutes of e-stim | 20 | 20 | 15 | 15 | ___ | ___ |

The total amount of minutes for that assessment period totaled a little over 500 on the corresponding MDS, or, in other words, just enough to keep the patient at an RV level for the next round of Medicare submissions.

53.    Defendants routinely attempt to justify the excessive minutes billed for e-stim and diathermy by using phrases such as "patient's skin condition was assessed prior to, during, and after e-stim treatment," "skin cleansed and hydrated for electrode placement," "electrodes applied, repositioned, removed," and "infection control measures provided before and after treatment" in the treatment notes of Beneficiaries. However, none of these actions require the skills of a qualified therapist, and therefore they cannot be properly billed to Medicare as therapy services.  Despite this, Defendant SNFs habitually bill Medicare for non-therapy services in order to "hug the RUG."

21

54.   As described above, Defendants knowingly submitted false claims to the Medicare program for medically unreasonable, unnecessary and unskilled therapy services, and used false records and statements to support those false claims in order to receive reimbursement at the highest RUG levels.

b.   Defendants Pressure their Employees to Inflate RUG Levels and Keep Facilities Full

55.   The pressure to inflate the RUG levels of Beneficiaries and keep the beds full at the Defendant SNFs comes from the very top. For example, in an email dated April 14, 2017, Michelle Gale-Nelson, a Registered Nurse for Defendant CHMS, wrote to Relator:

> A lot of things happening to stop the hemorrhages of cash . . . functional budgets, marketing plans, oversight of insurance contracts, etc. Census and RUG level pushes[.] Rick [CEO Richard Denning] will be drilling the admins [administrators] to find out if we are maximizing.

56.   Defendants' administrators are incentivized to maintain as many patients in Defendants' facilities as possible, as well as to qualify their patients at the highest RUG levels possible. Based on information and belief, Relator understands and believes that Defendants' administrators are given bonuses equal to seven-and-a-half percent of Defendants' net income without respect to any other standards.  The implication to Defendants' administrators is clear—maximize and inflate Medicare billings and maximize and inflate bonuses.

57.   It is common knowledge throughout Defendants' facilities that Defendants' administrators are pressured and incentivized to maintain a certain level of patients, and to ensure their patients are qualifying for the highest RUG levels possible. In a September 9, 2014 email, Defendant CHMS' Director of Rehabilitation Services, Lynn Schiff, wrote to Relator:

> Where would you like to go next Monday? Tuesday is Monrovia[,] Friday is Murrieta[.] We have some options[,] is there another facility Robin would like us to go to or we could go to Seal Beach or Laguna since they've both had

22

MDS minute issues and therapy documentation issues, utilization is high and it will not hold up. . . The admins [administrators] push the RU what's new[?]

58.    As recently as April 28, 2017, Defendant CHMS' Chief Operating Officer, Bryan Tanner, sent an email to all of Defendants' administrators to remind them of the importance of keeping the beds full at all Defendant facilities. The email reads, in part:

> [I]t has become very clear that too many things affecting census are 'falling through the cracks.' To provide increased accountability on many levels, beginning next Monday, May 1, every facility will start using 'tools' that will become part of your binder. These are: 1. Alert Sheet, 2. Referral/Denial Report . . . I will be paying particular attention to [the] section about why you didn't admit the patient. Again, we are looking for reasons to say "yes," not "no."

59.    Defendants' administrators are also required to attend monthly PPS meetings at all of the Defendant SNFs, even though those meetings are clinical in nature. Defendants track whether their administrators attend the PPS meetings. The other people in attendance at those meetings include the Directors of Nursing, Rehabilitation, and Medical Records, as well as the Assistant Directors of Nursing. Relator, as part of her employment responsibilities, attends the PPS meetings at all of the Defendant SNFs.

60.    During the PPS meetings, Relator has personally observed Defendants' administrators regularly ask the medical staff questions such as "why isn't this patient an RU?" and "can we at least get them to RV?"  Relator has personally observed Defendants' administrators apply tremendous pressure to Defendants' therapists to get patients into the RV and RU levels, and also to increase patients' lengths of stay in order to maximize revenue from Medicare.

61.    These corporate pressures caused Defendants' therapists to provide excessive amounts of therapy that were and are not medically reasonable or necessary. Because the targets are based in part on providing a specific number of therapy minutes per Medicare Beneficiary, therapists often did not, and do not,

23

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

1  developed individualized plans of care for Medicare Beneficiaries.  In addition,

2  Defendants' pressure caused therapists to provide services that did not qualify as

3  skilled rehabilitation therapy, such as e-stim and diathermy, simply to meet the

4  minimum criteria to qualify patients for RU and RV RUG levels.

5              ***3.***    ***Defendants are Aware of their Fraudulent Behavior***

6              62.    Defendant Arba owns all 38 SNFs listed as Defendants in this

7  Complaint. Defendant CHMS manages all 38 SNFs listed as Defendants in this

8  Complaint. Defendant Easton was the CEO of Defendant CHMS until February

9  2017. After Defendant Easton left the company, he was replaced by Defendant

10  Denning.

11             63.    During his time with Defendant CHMS, Defendant Easton and

12  Defendant CHMS' Chief Operating Officer, Bryan Tanner, along with other

13  employees from Defendant CHMS, met weekly with representatives of Defendant

14  Arba to discuss management issues. Defendant Easton is an "indirect owner" of

15  several Arba-owned facilities, including, but not limited to, Defendant Rinaldi

16  Convalescent Hospital, LLC, Defendant Ontario Healthcare Center, LLC, and

17  Defendant Casitas Care Center, LLC. The meetings between representatives for

18  Defendants CHMS and Alba are ongoing, though Defendant Easton is no longer

19  with the company. Current CHMS CEO Defendant Denning now attends these

20  meetings.

21             64.    Defendants were made aware of the allegations in this Complaint

22  numerous times over the past two years. In 2015, Relator submitted several audit

23  reports identifying improper billing practices to numerous officials at Defendant

24  CHMS, including: Teresa DePaul, the Director of Clinical Operations, Lynn Schiff,

25  the Manager of Therapy Services, and Defendant Easton. Despite Relator's

26  attempts to bring Defendants' fraudulent practices and actions to light, nothing was

27  done to address the issues.

28

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

65.     In March 2016, Noridian, a government Medicare Administrative Contractor ("MAC"), conducted an audit of Defendant Valley Palms Convalescent Center, LLC. The MAC audit identified $1.9 million in Medicare overpayments for fiscal year 2015-16, which was attributed to the fraudulent billing practices alleged in this Complaint.  Specifically, the audit noted that, of the 10 claims that were reviewed, 7 claims were improper because "Estim minutes billed did not support the skills of a therapist were needed." Additionally, Noridian identified an 80% billing error rate at that facility.

66.     Noridian identified numerous examples of documentation by Defendant SNFs that did not support the therapy minutes billed on their MDS Assessments. In its claim review summary, Noridian made observations that included, but are not limited to, the following:

| Date | Claims Findings |
|------|-----------------|
| 3/18/2016 | Documentation submitted did not support therapy minutes billed on MDS. It was noted 17% of PT and 12% of OT minutes billed in the month of December consisted of estim. Estim minutes were denied for PT on DOS 12/26 and for OT on DOS 12/28. |
| 3/22/2016 | [O]f note, unattended estim code was documented in therapy minutes, and only attended skilled therapy minutes can be counted included on the MDS. All OT estim minutes were denied, as documentation did not support the skills of a therapist were present and/or needed. |
| 3/22/2016 | Documentation submitted did not support all therapy minutes billed on MDS for assessment reference dates 1/5/16 and 1/11/16. It was noted 13% of PT and 12% of OT minutes billed consisted of estim. E-stim is allowed if the need for the skills of a therapist are supported in the documentation. Also of note, unattended e-stim code was |

25

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

> documented in therapy minutes, and only attended skilled therapy minutes can be counted on MDS. E-stim minutes were denied for PT on DOS 1/3, and all OT e-stim minutes were denied as documentation did not support the skills of a therapist.

67.     Noridian's observations of Defendants' improper billing practices mirrored the behaviors Relator witnessed and brought to her superiors' attention nearly a year before the MAC audit was released.

68.     A few months later, Relator again attempted to reinforce the inappropriateness of Defendants' billing practices to Defendant Easton. In an email dated June 9, 2016, Relator wrote: "I do feel we need to address the topic of 'Hugging the Rugs' a new term used to describe pattern billing of minutes exactly meeting the RUGs or a 10 min or less overages. This could impact $$$ but I feel strongly we need to evaluate our process." Defendant Easton replied "ok" to her email on the same day. However, until the day Defendant Easton left his position at the company, Relator never saw him take any steps to change the fraudulent activity at any of the Defendants.  The fraudulent practices continue to occur under Defendant Denning.

### 4.     *Defendants Intentionally Caused Financial Harm to the United States*

69.     Defendants engaged in a scheme to defraud the United States by submitting false and/or fraudulent statements and claims to the Medicare program that contained improperly inflated RUG levels and false representations regarding care being provided to SNF patients at Defendants' facilities. Each of the Defendants knew, or was deliberately ignorant or reckless in not knowing, that the claims and statements being generated by the above-described practices were false or fraudulent. Relator estimates that the financial harm to the United States due to Defendants' fraudulent actions is in excess of $337 million.

26

## VI.

## CLAIMS FOR RELIEF

**A.    First Claim for Relief: False and/or Fraudulent Claims, 31 U.S.C.**
**§ 3729(a)(1)(A)**

70.    Relator incorporates paragraphs 1–69 of this complaint as though fully set forth herein.

71.    This claim sets forth claims for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729–33, as amended.

72.    Through the above-described acts and omissions, and from at least on or before 2015 to the present, the Defendants knowingly caused to be presented for payment and approval false and/or fraudulent claims to officers of the United States Government. As a result of this illegal activity, these claims were improper pursuant to 31 U.S.C. § 3729(a).

73.    Federal Medicare program officials, their contractors, carriers, intermediaries and agents, paid and approved claims for payment for such services that should not have been paid or approved.

74.    Federal Medicare program officials and their contractors, carriers, intermediaries and agents, would not have paid the claims for services or otherwise reimbursed or advanced monies to the Defendants had they known the true state of affairs.

75.    As described in greater detail above, Defendants abused the Medicare program by submitting false claims for medically unreasonable, unnecessary and unskilled therapy services, and by using false records and statements to support those claims.

76.    By reason of the above-described presentment of false and fraudulent claims, Defendants have violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval.

27

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

77.    Because of the false claims made by Defendants, the United States has suffered, and continues to suffer, financial damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus civil penalties of $5,500 to $11,000 for each such claim submitted on or before November 2, 2015, and $10,781 to $21,562 for each such claim submitted after November 2, 2015.

78.    By reason of the above-described presentment of false records and statements, the United States has suffered significant losses in an amount to be determined.

**B.    Second Claim for Relief: False Records and Statements, 31 U.S.C. § 3729(a)(1)(B)**

79.    Relator incorporates paragraphs 1–78 of this complaint as though fully set forth herein.

80.    This claim sets forth claims for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729–33, as amended.

81.    Through the above-described acts and omissions, and from on or before at least 2015 to the present the Defendants knowingly made and used, and caused to be made and used, false records and statements for the purpose of having false and fraudulent claims paid and approved by Federal Medicare program officials, their contractors, carriers, intermediaries and agents. As a result of this illegal activity, these claims were improper in whole pursuant to 31 U.S.C. § 3729(a).

82.    Because of the false claims made by Defendants, the United States has suffered, and continues to suffer, financial damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus civil penalties of $5,500 to $11,000 for each such claim submitted on or before November 2, 2015, and $10,781 to $21,562 for each such claim submitted after November 2, 2015.

28

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

83.   By reason of the above-described presentment of false records and statements, the United States has suffered significant losses in an amount to be determined.

**C.**   **Third Claim for Relief: Conspiracy to Defraud, 31 U.S.C. § 3729(a)(1)(C)**

84.   Relator incorporates paragraphs 1–83 of this complaint as though fully set forth herein.

85.   This claim sets forth claims for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729–33, as amended.

86.   Through the above-described acts and omissions, and from on or before at least 2015 to the present, the Defendants, with each other and with persons known and unknown, knowingly agreed and conspired to defraud the Government by having false and fraudulent claims paid and approved by Federal Medicare program officials, their contractors, carriers, intermediaries and agents. As a result of this illegal activity, these claims were improper pursuant to 31 U.S.C. § 3729(a)(1)(A)–(B).

87.   Because of the false claims made by Defendants, the United States has suffered, and continues to suffer, financial damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus civil penalties of $5,500 to $11,000 for each such claim submitted on or before November 2, 2015, and $10,781 to $21,562 for each such claim submitted after November 2, 2015.

88.   By reason of the above-described conspiracy to defraud, the United States has suffered significant losses in an amount to be determined.

**D.**   **Fourth Claim for Relief: False Statements to Conceal Obligations, 31 U.S.C. § 3729(a)(1)(G)**

89.   Relator incorporates paragraphs 1–88 of this complaint as though fully set forth herein.

29

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

90.   This claim sets forth claims for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729–33, as amended.

91.   Through the above-described acts and omissions, the Defendants knowingly made and used, and/or caused to be made and used, false records and statements in order to conceal, avoid and/or decrease the Defendants' obligations to pay or transmit monies or to offer certain prices to Federal Medicare programs.

92.   By reason of the above-described, Defendants have violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

93.   Because of the false claims made by Defendants, the United States has suffered, and continues to suffer, financial damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus civil penalties of $5,500 to $11,000 for each such claim submitted on or before November 2, 2015, and $10,781 to $21,562 for each such claim submitted after November 2, 2015.

94.   Because of the false or fraudulent claims made by Defendants, the United States has suffered, and continues to suffer damages.

## **PRAYER**

WHEREFORE, Relator Jeannette Munkittrick, on behalf of the United States, respectfully requests that this Court enter an Order:

a.   Determining that Defendants violated the Federal False Claims Act by making false statements and records to cause false claims to be submitted to the United States;

b.   Requiring Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants'

30

1    actions, plus a civil penalty against Defendants of not less than $5,500

2    and not more than $11,000 for each violation of 31 U.S.C. § 3729

3    committed before November 2, 2015, and not less than $10,781 and

4    not more than $21,562 for each violation of 31 U.S.C. § 3729

5    committed after November 2, 2015;

6    c.    Requiring that Defendants cease and desist from violating the Federal

7          False Claims Act;

8    d.    Requiring Defendants to pay all expenses, attorney's fees and costs

9          associated with this action pursuant to 31 U.S.C. § 3730(d)(1);

10   e.    Paying Relator Jeannette Munkittrick the maximum statutory award

11         for her contributions to this prosecution of this action pursuant to 31

12         U.S.C. § 3730(d);

13   f.    Granting the Government and Relator all such other relief as the Court

14         deems reasonable, proper, and just.

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

COMPLAINT

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

## **DEMAND FOR JURY TRIAL**

A jury trial is demanded for all issues.

DATED:  November 14, 2017

Respectfully submitted,

By  */s/ Stephen G. Larson*

Stephen G. Larson (SBN 145225)
Melissa A. Meister (SBN 296744)
Jarrad L. Wood (SBN 310688)
LARSON O'BRIEN LLP
555 S. Flower Street, Suite 4400
Los Angeles, CA  90071
Tel:  213-436-4888
Fax:  213-623-2000
*slarson@larsonobrienlaw.com*
*mmeister@larsonobrienlaw.com*
*jwood@larsonobrienlaw.com*

Attorneys for Relator
JEANNETTE MUNKITTRICK

DATED:  November 14, 2017

Respectfully submitted,
JAMES HOYER,  P.A.

By  */s/ Jesse L. Hoyer*

Jesse L. Hoyer (SBN 076934)
*Pro Hac Vice to be filed*
Elaine Stromgren (SBN 417610)
*Pro Hac Vice to be filed*
Sean P. Keefe (SBN 413828)
*Pro Hac Vice to be filed*
JAMES HOYER, P,A.
2801 W. Busch Blvd. Suite 200
Tampa, FL 33618
Tel.: 813-375-3700
Fax: 813-375-3710
*jlhoyer@jameshoyer.com*
*estromgren@jameshoyer.com*
*skeefe@jameshoyer.com*

Attorneys for Relator
JEANNETTE MUNKITTRICK

COMPLAINT

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)

1

## <u>SERVICE</u>

2

Pursuant to 31 U.S.C. § 3730(b)(2), this Complaint shall not be served upon

3

Defendants until the Court so orders.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

COMPLAINT